A controversy arose between the trustees and appellants (Peter Petersen and Clara Belle Petersen, husband and wife) concerning property which appellants had in their possession. The trustees contended that the bankrupt owned the property on November 1, 1945, and November 15, 1945, and that therefore title thereto was vested in them.[2] Appellants disputed the trustees' contentions and contended that they, appellants, owned the property on November 1, 1945, and at all times thereafter.

The trustees petitioned the court for a determination of the controversy. Appellants answered the petition, and a hearing was had before the referee. Thereafter the referee entered an order determining the controversy. On petition of appellants, the court (a judge thereof presiding) reviewed the referee's order and on April 19, 1948, entered an order which reversed and set aside the referee's order and recommitted the matter to the referee for further hearing. From the order of April 19, 1948, this appeal was taken.

The trustees have moved to dismiss the appeal on the ground that the order of April 19, 1948, was not appealable. Obviously, the order of April 19, 1948, was not a final order. It was not an order in proceedings in bankruptcy, either interlocutory or final. It was, instead, an interlocutory order in a controversy arising in proceedings in bankruptcy.[3] Such an order is not appealable.[4]

The motion is granted, and the appeal is dismissed.

## In re RECOMMENDATION OF THE LOCAL ADVISORY BOARD FOR OKLAHOMA COUNTY IN THE OKLAHOMA CITY DEFENSE RENTAL AREA.

### No. 485.

United States Emergency Court of Appeals.

Heard at Oklahoma City Nov. 8, 1948.

Filed Nov. 13, 1948.

---

[1] See Petersen v. Christ's Church of the Golden Rule, 9 Cir., 170 F.2d 555.

[2] See § 70, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 110, sub. a.

[3] See § 24, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 47, sub. a.

[4] Goldie v. Carr, 9 Cir., 116 F.2d 335.

Charles P. Liff, Chief, Appeals Section, of Washington, D. C. (Ed Dupree, General Counsel, and Benjamin Freidson, both of Washington, D. C., all of the Office of the Housing Expediter, on the brief), for the Housing Expediter.

John W. Swinford and De Witt B. Kirk, both of Oklahoma City, Okl., for the Local Advisory Board for Oklahoma County in the Oklahoma City Defense-Rental Area.

John H. Halley, of Oklahoma City, Okl., for the Oklahoma Apartment Owners Association, Inc., amicus curiae.

Durward McDaniel, of Oklahoma City, Okl., filed a brief for the CIO National Housing Committee, the Oklahoma State Industrial Union Council, CIO, and the Oklahoma County Industrial Union, CIO, amici curiae.

Before MARIS, Chief Judge, and McALLISTER and LINDLEY, Judges.

LINDLEY, Judge.

The Local Advisory Board for Oklahoma County in the Oklahoma City Defense-Rental Area created and organized in pursuance of Sec. 204(e) of the Housing and Rent Act of 1947, as amended by the Housing and Rent Act of 1948, 50 U.S.C.A. Appendix, § 1894(e), having complied with the procedural requirements of the act, and having considered the questions whether it should recommend decontrol of rents in Oklahoma County, a portion of the defense-rental area, and whether a general increase in the maximum rents existing in Oklahoma County should be recommended, voted first to deny any recommendation for decontrol in Oklahoma County. Following this, the board denied a proposal to recommend a general increase of maximum rents in the county by 30% and eventually adopted a resolution recommending that the maximum rents established as of March 1, 1942, the rent freeze date in Oklahoma County, be increased 25%. Upon receipt of the recommendation, the Housing Expediter agreed that it was appropriately substantiated and in accordance with applicable law and regulations to the extent of an increase of 15% and made amendments to the appropriate regulations giving effect to approval of so much of the recommendation. That portion of the recommendation for an increase in excess of 15% he disapproved on the ground that it was not appropriately substantiated and in accordance with applicable laws and regulations. Thereupon, the record, including the recommendation and findings of the board, the evidence submitted before that body, the Expediter's statement and the additional material submitted by him, was filed in this court.

We are confronted with no dispute as to the underlying facts or as to the evidence presented to the board and considered by it and by the Expediter. Nor do we have any question as to the propriety of the action of the board insofar as compliance with procedural requirements is concerned. The issue presented is whether the recommendation of the board as to the additional

10%, over and above the 15% increase which the Expediter approved, should be approved in whole or in part. The resolution of such issue obviously requires some discussion of the facts even though they are undisputed.

The board found "that the weight and majority of the competent evidence conclusively proves" that the general rent level in the area controlled "is inadequate and inequitable"; that the net operating income of controlled housing units within the area is lower currently than it was in the base period beginning March 1, 1942, and that the rent level upon which the maximum rents were fixed in the year 1942 was abnormally low. The Expediter agrees that the net operating income from maximum rents is currently lower than it was in the base year but insists that the increase of maximum rents because of that factor should not exceed 6%. He agrees also that the rent level in the base period, upon which maximum rents were fixed, was abnormally low but insists that, under the evidence, the total increase proper on account of this factor is 9%, making a total increase on account of both factors of 15%, which he approved.

We have examined carefully the evidence bearing upon the question of whether the rents were abnormally low in the base period. There is no dispute, as we have said, that they were abnormally low, and the disagreement of the parties is solely as to the date upon which said abnormality producing adverse effects upon rentals in the base period first became evident. The Expediter selected March 1, 1939, as the last date free of any adverse conditions affecting rents in the area. The board concluded that March 1, 1937, was the proper date, for the reason, as it said, that adverse conditions appeared shortly thereafter.

There is no question that Oklahoma City decreased in population prior to March 1, 1942, due to migration of residents seeking employment in other cities where the construction of defense plants was initiated prior to the onset of any such activities in Oklahoma City. That decrease in population eventually amounted to some 11% and undoubtedly resulted in a higher rate of vacancies in housing accommodations and in depressed rentals of such accommodations. This both parties admit. But the defense activities attracting population from Oklahoma City to neighboring communities, we find from the record, did not become appreciably evident until after March 1, 1939. They then began, and the resulting migration of employees followed. The school population had a substantial decline in 1939, a greater one in 1940, and a still greater one in 1941. The rate of vacancies gradually increased from March 1, 1939, until some time in the latter part of the year 1942, when changing conditions in the city reversed the tide and resulted in an influx in population and an end to the depressed rental conditions. We are satisfied that the weight of the evidence does not show that these adverse conditions affected the rent levels in Oklahoma City before March 1, 1939. We conclude, therefore, that the board was not justified in finding that the adverse conditions affecting the rent levels were in existence prior to that time. The undisputed evidence establishes that the rent level on March 1, 1942, was 9% below that of March 1, 1939. Consequently we cannot approve a recommendation for an increase in maximum rents on this account in excess of 9%.

We turn then to the other factor which the board considered in arriving at its recommendation of a total increase of 25%, namely, the deterioration in the landlords' net rental income between March 1, 1942, and 1948. The board found that there had been an increase in operating expenses between 1942 and 1948 amounting to upwards of 15% of the 1942 gross rental income, and its proposed 25% increase included this factor in substantial measure, the exact amount, however, not being disclosed in its recommendation. The Housing Expediter approved the recommendation with respect to this factor to the extent of 6% only and disapproved all in excess of that amount. His action was based upon his theory that, in determining the amount of a general increase in rents necessary by reason of a deterioration in

the net operating position of the rental industry, the amount of additional rental to which that industry is entitled is to be measured by the difference between its net rental income in 1942 and its net rental income in 1948. Applying that theory, there is no doubt that the evidence in this record would justify an increase of only 6% on account of this factor, the amount approved by the Expediter.

We agree with the Expediter that the board's basis of computation was not justified, but we also find ourselves in partial disagreement with the Expediter's theory as applied to the facts of this case. This is because the board's recommendation in this case is not for a flat 25% increase in current maximum rents. On the contrary, the board's recommendation was that its proposed 25% increase be applied primarily to the maximum rents established as of March 1, 1942, and that, except for rent adjustments for major capital improvements, increase or decrease of space, services, furniture, furnishings and equipment, subletting and increase or decrease of occupancy, and blood, personal or other special relationship between owner and occupant, all rental adjustments made after March 1, 1942, under the provisions of existing or prior law should be considered as included in and absorbed by the proposed 25% increase. Moreover, the board specifically recommended that rental units covered by voluntary leases involving 15% rental increases under existing law should not have the benefit of its recommended increase of 25%.

■ It follows, we think, that in comparing the present net operating position of the rental industry with its position in 1942 for the purpose of determining the general increase in rents required to alleviate the hardship being suffered by the industry in this respect, there should be excluded from consideration such additional rental as is now being received by landlords as the result of rental adjustments other than those above-mentioned, as well as the additional income received by those landlords who have entered into voluntary leases at a 15% rental increase. On the other hand, for this purpose, there should be

taken into consideration all increased rental now being received by the industry from housing accommodations which were vacant in 1942 and which by reason of increased occupancy since that date are now producing income. Likewise, there should be considered the additional rental now being received by landlords who have received adjustments of the kinds above specifically referred to, to which the board's recommendation is applicable. Examining, in this light, the pertinent evidence, which in this regard is not as clear and detailed as might be desired, we think that it justifies a somewhat larger increase on account of depreciation in the industry's operating position between 1942 and 1948 than the Expediter approved, but somewhat less than the board recommended.

We have carefully considered the entire record. It would serve no useful purpose to discuss the evidence in detail. It is sufficient to state our conclusion that an increase of 11% in those maximum rents to which the board's recommendation is applicable is justified in this respect.

■ In summary, therefore, we hold that the recommendation of the board is appropriately substantiated by adequate evidence of sufficient weight to justify it to the extent of a general increase in maximum rents in the amount of 20%, applicable as recommended by the board. An order will accordingly enter approving the recommendation of the board to the extent of an increase of 20% and disapproving it as to the increase recommended in excess of 20%.

Amici curiae challenge the organization of the board. No question as to the validity of the board's creation was raised in the hearings before it. The objection now urged is that the Expediter, in creating the board, did not comply with the requirements of Sec. 204(e) (1) of the act as to representatives of the affected interests in the area.

■ We think it wholly beyond our function, as defined by the Congress, to enter upon any collateral inquiry as to the propriety of the Expediter's action in this respect. Under Sec. 204(e) (4) we have

jurisdiction only to enter "an order approving or disapproving the recommendation of the local board." Congress has not seen fit to grant to us authority to review the discretion of the Expediter in creating the board; it has conferred upon us jurisdiction only to determine whether "the recommendation is * * * in accordance with law, or" whether "the evidence * * * is * * * of sufficient weight to justify such recommendation," and, upon such determination, to approve or disapprove. This is the limit of our jurisdiction under the Housing and Rent Act of 1947, as amended.